Philip **BARASH,** as preliminary executor of the Estate of Celia Kates, Plaintiff,

v.

Gloria **KATES,** a/k/a Gloria Haberman, Defendant.

Case No. 04–80159–Civ.

United States District Court, S.D. Florida.

Oct. 12, 2006.

cause.

See also 2005 WL 3088695.

James M. McCann, Esq., West Palm Beach, FL, for Plaintiff.

Philip Barash, Plaintiff pro se.

Roy Edmund Fitzgerald III, Esq., Page Mrachek Fitzgerald & Rose, West Palm Beach, FL, Julie S. Ferguson, Esq., for Defendant.

### ORDER IMPOSING SANCTIONS UPON PHILIP BARASH SUA SPONTE, IN AN AMOUNT TO BE DETERMINED AT A LATER DATE, GRANTING DEFENDANT'S MOTION FOR SANCTIONS IN PART, AND ORDERING PARTIES TO SUBMIT MEMORANDA OF LAW AND SUPPORTING MATERIALS AS TO THE AMOUNT OF SANCTIONS TO BE IMPOSED (DEs 60, 68)

JAMES M. HOPKINS, United States Magistrate Judge.

**THIS CAUSE** comes before the Court *sua sponte* and upon Defendant's Motion for Sanctions. (DEs 60, 68).

On October 4, 2005, this Court Issued an Order to Show cause requiring Philip Barash ("Barash") and counsel for Plaintiff, James M. McCann, Esq., ("McCann"), to show cause why sanctions should not be imposed in light of the proceedings which had occurred at the bench trial conducted by this Court from March 14 to March 15, 2005. (DEs 48–50, 52–54, 56, 60). Defendant also filed her own motion for sanctions. (DEs 68, 69). After reviewing the submissions of the parties, this Court set the matter for hearing on September 26, 2006. (DEs 64, 65, 68, 69–73, 78–81, 83, 87). For the reasons that follow, **IT IS HEREBY ORDERED THAT** Barash be sanctioned, pursuant to the Court's inherent authority, in an amount to be determined at a later date. Moreover, for the reasons that follow, **IT IS ORDERED THAT** McCann not be sanctioned in this matter. As such, **IT IS FURTHER ORDERED THAT** Defendant's Motion for

Sanctions be **GRANTED IN PART AND DENIED IN PART.** (DE 68).

## PROCEDURAL BACKGROUND

On February 20, 2004, the instant case commenced with the filing of a Complaint for Damages and Injunctive Relief. (DE 1). Listed as Plaintiffs were Sandra Barash ("Sandra"), acting under a durable power of attorney for Celia Kates ("Celia"), and Celia. (DE 1, pg. 1). Celia is the mother of both Sandra and Defendant, Gloria Kates ("Gloria"). (DE 1, pg. 1). Attorney James P. McCann ("McCann") signed the complaint on behalf of Plaintiff. (DE 1, pg. 9).

In the complaint, Plaintiff alleged that in 1992, Celia opened a joint stock brokerage account, naming Gloria as the other account holder, for the purpose of avoiding probate by placing Gloria's potential future inheritance into the account. (DE 1, pg. 2). Celia and Gloria were listed as joint tenants with rights of survivorship. (DE 1, pg. 2). The complaint alleges that Gloria was not advised of the existence of the account. (DE 1, pg. 2).

According to the complaint, in November of 2000, Celia became ill and was hospitalized.[1] Following her release, on November 17, 2000, while allegedly under fear of impending death, Celia signed a letter wherein she resigned her positions of Trustee and Successor Trustee from the Irving Kates Trust and the Celia Kates Trust. (DE 1, pg. 3; DE 50, Plaintiff's Trial Exhibit 41). In the letter, Celia directed, *inter alia,* that the funds from Trust account number 307–26620 should be transferred to Gloria individually. (DE 50, Plaintiff's Trial Exhibit 41).

Celia eventually recovered from her illness, and on February 18, 2004, McCann, on behalf of Celia, sent a letter to Gloria claiming that the transfer to account number 307–26620 was a gift made in contemplation of death, that Celia was revoking such gift, and that Celia demanded that the assets of the account be returned. (DE 1, pg. 4, Exh. A). After Gloria failed to return the assets, at the age of ninety-seven (97), Celia filed the instant complaint asserting five (5) causes of action: (I) Money Had and Received; (II) Restitution; (III) Unjust Enrichment; (IV) Imposition of a Constructive Trust; and, (V) Imposition of a Resulting Trust. (DE 1, pgs. 1–7; DE 50, Plaintiff's exh. 36).

On August 10, 2004, Celia died, and upon motion by Sandra Barash, Sandra's husband, Philip Barash ("Barash"), was substituted as the party Plaintiff as the executor of Celia's estate. (DEs 19, 20).

## THE TRIAL

The case proceeded to trial before the undersigned on March 14–15, 2005. (DEs 48, 49, 50, 52, 53). At trial, Plaintiff was represented by McCann. Barash was the only witness who testified on behalf of Plaintiff. For purposes of the sanctions issue presently before the Court, the Court focuses on three areas of testimony given by Barash at trial.

First, on direct examination, upon being shown Plaintiff's exhibit 41, the letter dated November 17, 2000, Barash was directly asked whether he played any role in the preparation of the letter. (DE 52, pg. 119). Barash stated that he did not. (DE 52, pg. 119). Barash testified that a copy of the November 17 letter came to him in the mail, and that he had no conversations with Celia regarding the letter prior to receiving the letter. (DE 52, pg. 120, 121).

---

[1]. The facts surrounding Celia's hospitalization are set forth in more detail in the Court's Memorandum of Decision which was issued following the bench trial held in March of 2005. (DE 58). Because such details are not necessary to the resolution of the sanctions issues at bar, they will not be repeated here.

Barash further testified that after receiving the letter, he called Celia to ask why she was removing herself as trustee for the trusts described in the letter, to which she replied that she wanted "everything to be in order" when she died, and that she did not "want her girls to have any problems." (DE 52, pgs. 121–122). According to Barash, after he asked Celia why she thought she was going to die, Celia stated that she was "in terrible pain," that she "could not remember anything," that she was "incontinent," and that she "did not want to live this way." Barash stated that he had no other conversations with Celia regarding the letter. (DE 52, pgs. 122–123).

Next, during Barash's cross examination, Barash was asked whether he brought a lawsuit in the Eastern District of New York ("the New York litigation" or "the New York action") to seek to set aside the joint account of Gloria and Celia.[2] (DE 52, pg. 174). After Barash replied that his name was not on the lawsuit, counsel inquired whether Sandra prepared the papers and pleadings, or whether Barash did so. (DE 52, pg. 174). Barash answered that "... Celia sat at my computer and she dictated the entire lawsuit," including the sworn statements filed in conjunction with the lawsuit. (DE 52, pg. 175). Upon being asked whether the information contained in the sworn statements was accurate or true, Barash testified that the information was not true, as far as he and his wife Sandra were concerned, but that they did what Celia said. (DE 52, pgs. 175–176). When counsel pressed Barash as to whether he and his wife signed statements that they knew to be false, Barash stated that although he and Sandra knew nothing about any oral agreement, in Celia's mind there had been

an oral agreement, and that "... when Celia told you to do something, you did it." (DE 52, pg. 176). When counsel again questioned Barash as to whether he lied in the New York action when he swore in his statement that in his presence, he was witness to an oral contract, Barash replied that "Celia dictated it, and that's how I wrote it." (DE 52, pg. 178).

Finally, the Court recalls Barash's cross examination as to the events that occurred following his receipt of the letter dated November 17, 2000. (DE 52, pgs. 119–206). After Barash was asked whether he knew in advance of his receipt of the letter that the letter would be coming, Barash stated that he "was totally surprised" by receiving the letter. (DE 52, pg. 199). Counsel then directed Barash's attention to a prior deposition which had been given on August 10, 2001, wherein Barash stated that he had prepared the November 17 letter, and that the form was dictated by the brokerage firm of Solomon Smith Barney. (DE 52, pgs. 200, 201). In reply, Barash adamantly stated that he did not prepare the November 17 letter, that the form would not have been dictated by Solomon Smith Barney, and that the deposition had never been sent to him for correction and signing. (DE 52, pgs. 200–202).

In keeping with Barash's direct examination testimony that he was surprised to receive the November 17 letter in the mail, and that he called Celia to question her regarding the letter a few days after receiving it, counsel also inquired as to whether Barash, during his phone call with Celia, questioned Celia as to the logic of Celia's signing the November 17 letter. (DE 52, pgs. 202–204). Counsel noted that the November 17 letter was not necessary to accomplish Celia's stated goal of provid-

2. Although the transcript refers to the joint account as being owned by Gloria and Sandra, the Court notes that all the evidence in the record shows that the joint account at issue was owned by Celia and Gloria.

ing for her daughters after her death because Celia had a joint account with Gloria whereby they owned the account as joint tenants with a right of survivorship, and the funds in the account would have automatically passed to Gloria upon Celia's death, and because Celia would have been automatically removed as trustee from the trusts upon her death. (DE 52, pgs. 202–204). However, Barash merely replied that he never discussed such matters with Celia "[b]ecause you don't question Celia," and "[i]t's not something you said to Celia Kates." (DE 52, pgs. 203, 204). After counsel further questioned Barash about whether he would perjure himself if Celia asked him to, Barash stated, "Yep. She's an old lady, she's entitled for you to do what she directs." (DE 52, pg. 203).

Counsel then turned to Barash's most recent deposition given on January 19, 2005, contained in Defendant's exhibit 24. (DE 42, pgs. 204–209). Counsel again began by recalling that at the bench trial, Barash testified that after he received the letter of November 17, 2000, he called Celia a few days later to discuss the matter. (DE 52, pg. 204). However, counsel next noted then when Barash was deposed in 2001, Barash testified that he knew all about the letter because he prepared it for Celia. (DE 52, pg. 205). Moreover, counsel further noted that when Barash was deposed in 2005, Barash testified as to a third version of events surrounding the November 17 letter: that Celia told Barash about the November 17 letter on November 17, and that Celia stated that she was going to send him a copy. (DE 52, pg. 205). When counsel then asked Barash which version of the events surrounding the November 17 letter was correct, Barash reiterated that after he received the letter in the mail, he called Celia on or about November 19 or 20, and they discussed it over the telephone. (DE 52, pg. 206). Finally, counsel pointed out that although Barash testified that he spoke with Celia every day over the telephone, and that they would presumably have spoken on the phone on November 17, Celia did not mention the fact that she had signed a letter resigning her position as trustee of the two trusts, and transferring the assets of the trusts to accounts held by her daughters. (DE 52, pg. 207). Barash replied, ". . . I do the best I can to remember, but I can't be absolutely sure." (DE 52, pg. 207).

It should be noted that during his testimony at trial, the Court observed Barash glaring at Gloria with obvious expressions of anger and resentment. Moreover, the Court repeatedly admonished Barash for interjecting himself into conversations between the Court and counsel, for speaking over objections by counsel, for attempting to lodge objections himself, and for asking questions of his own and opposing counsel during his examination. (DE 52, pgs. 52, 81, 84, 86, 125, 148, 158, 160, 171, 172, 174, 189, 191, 288, 300–301, 303, 311). Despite such admonishments, Barash continued to behave imperiously.

After reviewing the written closing arguments of the parties, the Court entered Judgment in favor of Defendant on October 4, 2005. (DEs 54, 56, 57, 59). The reasons for the Judgment are contained in a separately issued Memorandum of Decision, which was also entered on October 4, 2005. (DE 58).

### THE COURT'S ORDER TO SHOW CAUSE

Along with the Memorandum of Decision and Judgment, the Court entered an Order to Show Cause directing Barash and McCann to show cause why sanctions should not be imposed against Barash pursuant to Rule 11, 28 U.S.C. § 1927, or the Court's inherent authority, and against McCann pursuant to section 1927 or the Court's inherent authority. (DE 60, pg.

2). The Court's concerns are summarized in the Order to Show Cause as follows:

The Court contemporaneously herewith has issued its Memorandum of Opinion and Judgment regarding the dispute in this action. Said Memorandum of Opinion and Judgment were issued following a two-day bench trial before the undersigned at which testimony disclosed that the Plaintiff had perjured himself before the United States District Court for the Eastern District of New York in prior litigation (the "New York Litigation") among the parties or persons in privity with them. The New York Litigation sought to recover the funds also sought in this action albeit on a different theory. The Plaintiff repudiated that theory on the record in this case, notwithstanding Plaintiff's prior adoption and affirmative advocacy of that theory under oath. In the matter at bar, the Court raises the issue whether the Plaintiff also has been purposefully deceptive in his testimony and the facts of this litigation.

With respect to Plaintiff's counsel, the Court believes an inquiry regarding possible sanctions pursuant to 28 U.S.C. § 1927, and the Court's inherent power, is appropriate based upon the Plaintiff's repudiation of the oral contract theory in the New York Litigation, the absence of evidence supporting a gift *causa mortis* outside of Plaintiff's testimony, Plaintiff's history of manipulating legal process for his own illicit purposes, and the assertion of the gift *causa mortis* theory for the first time in this litigation. The Court is especially concerned with the origin of, and basis for, this theory in light of the New York Litigation.

(DE 60).[3] The Court also ordered Barash and McCann to "address the prior litigation history among the parties and those persons in privity with the parties, including the nature and results of such litigation, and any judicial opinion rendered therein." (DE 60, pg. 2). Finally, the Court noted that Defendant would be permitted to file her own motion for sanctions, independent from the Court's Order to Show Cause. (DE 60, pg. 3).

In response to the Order to Show Cause, McCann, on behalf of himself and Barash, filed memoranda wherein he argued that sanctions were not warranted against either of them, as well as supporting affidavits addressing the development of the instant case and the prior litigation history of the parties. (DEs 64, 65, 71, 72, 73, 80, 85). Defendant also filed her own Motion for Sanctions, which was supported by various memoranda of law and affidavits of counsel. (DEs 68, 69, 70, 78, 79, 81, 83).

### THE PARTIES' LITIGATION HISTORY AND BACKGROUND OF BARASH

The following litigation history is taken from affidavits submitted by Barash and Defendant's counsel, as well as the bench trial conducted in this matter.

In March of 2001, Gloria retained the firm of Page, Mrachek, Fitzgerald & Rose, P.A. to represent her and her two sons, Paul and Eric Siler ("Paul" and "Eric"). (DE 70).

On April 30, 2001, in case number CA–01–4172–AI, Barash and his wife, Sandra, filed an action against Gloria and her son Paul in the Fifteenth Judicial Circuit in and for Palm Beach County, asserting causes of action for defamation and breach of fiduciary duty with respect to alleged improper administration of the Irving Kates Trust. (DE 66, pg. 2; DE 70, pg. 2, exh. A). The defamation claim related to a letter that Gloria and Paul had sent to Solomon Smith Barney on March 12, 2001,

---

**3.** The Court referred to Barash as Plaintiff.

wherein Gloria stated that she believed her signature had been forged on a document which would have allowed Sandra to transfer funds from the Celia Kates and Irving Kates trusts into Sandra's own account. (DE 70, pg. 2). In the counterclaim filed by Gloria and Paul in the action, Gloria alleged that she did not sign the letter that Sandra submitted to Solomon Smith Barney, and that she did not consent to the transfer of the funds from the trust accounts to the personal account of Sandra. (DE 70, pg. 2, exh. A). In addition, Gloria alleged that Sandra and Philip had repeatedly attempted to remove her as trustee from the trusts so that they could have total control and transfer the funds into their own accounts. (DE 70, pg. 2, exh. A). On March 19, 2001, after receiving unauthorized requests to transfer from Sandra, and after being notified that Gloria did not consent to the transfer of funds out of the Celia Kates Trust account, Solomon Smith Barney froze the accounts. (DE 70, pg. 3). On September 26, 2001, the action was settled, along with another lawsuit, case number CP–01–2330–IB. (DE 66, pg. 2; DE 70, exh. B).

In case number CP–01–2330–IB, which was also filed on April 30, 2001, Celia sought to remove both Gloria and Sandra as trustees of the Irving Kates Trust. (DE 66, pg. 2; DE 70, pgs. 3–4). The litigation began after Gloria refused a request by Sandra and Barash to approve disbursements in the amount of one hundred and fifty seven thousand dollars ($157, 000.00) from the Irving Kates Trust to renovate Celia's Palm Beach oceanfront condominium and for the purchase of a Cadillac. (DE 70, pg. 4). The matter finally settled with the appointment of corporate trustee to replace Celia, Sandra, and Gloria as trustees, and the creation of three subtrusts, one each for Celia, Sandra, and Gloria. (DE 66, pg. 2; DE 70, pg. 4, exh. B). A provision of the settlement provided that certain funds could not be used from the Celia Kates Trust, directly or indirectly, for the purposes of Sandra and Barash unless Gloria received an equivalent amount during that year. (DE 70, pg. 4, exh. B).

In October of 2001, in case number CV01–6990, Sandra, acting under a power of attorney for Celia, filed an action against Gloria in the United States District Court for the Eastern District of New York, again complaining about Gloria's alleged refusal to provide for Celia out of the Irving Kates Trust. (DE 66, pg. 2; DE 70, pg. 9). In that action, Sandra and Barash submitted affidavits,[4] wherein they swore to the existence of an oral contract between Gloria, Sandra and Celia concerning the joint accounts and the Irving Kates Trust (a theory inconsistent with the *gift causa mortis* theory four years later developed in this case). (DE 70, pg. 9). The New York action was dismissed by the court before Gloria was served with the complaint because the court ruled that Sandra could not represent Celia under a power of attorney. (DE 66, pgs. 2–3; DE 70, pg. 9).

In November of 2001, in case number CV 01–7828, Barash filed an action in the United States District Court for the Eastern District of New York against two of Gloria's sons, Paul and Eric, in an attempt to recover on a promissory note executed in 1975 in favor of their grandfather, Irving Kates. (DE 66, pg. 3; DE 70, pg. 9, exh. J). After the court granted a motion for summary judgment filed on behalf of Eric and Paul, Barash appealed to the United States Court of Appeals for the

---

4. On cross examination at the bench trial herein, Barash admitted that he knew that the affidavits were false at the time they were filed in the New York action. (DE 52, pgs. 175–176, 178).

Second Circuit. (DE 70, pg. 9). The Second Circuit, in case number 02–9161, remanded the matter for the district court to consider whether the "probate exception" to federal diversity jurisdiction or equitable tolling principles applied to the case. (DE 70, pg. 9). On remand, the court dismissed the action, finding that although the "probate exception" did apply, equitable tolling did not toll the claims. (DE 66, pg. 4; DE 70, pg. 9, exh. K). Once again, Barash appealed the order of the District Court to the Second Circuit. (DE 66, pg. 4; DE 70, pg. 9). In case number 04–2430–CV, the Second Circuit affirmed the order of the District Court. (DE 66, pg. 4; DE 70, pg. 9).

On an unspecified date in the year 2005, in case number 05–010624, on behalf of Celia's estate, Barash filed another action in the New York State Supreme Court against Paul and Eric in an attempt to recover on the promissory note executed in 1975. (DE 66, pg. 4; DE 70, pg. 10). At the time that Barash and defense counsel submitted their affidavits in response to the Court's Order to Show Cause, the court had yet to rule on a motion to dismiss filed by Paul and Eric. (DE 66, pg. 4; DE 70, pg. 10).

In January of 2003, Barash filed an action against Todd Siler ("Todd"), a third son of Gloria's. (DE 66, pg. 6; DE 70, pg. 10). In case number 03–00616AD, filed in the Fifteenth Judicial Circuit in and for Palm Beach County, Barash sought to recover on a 1998 promissory note allegedly signed by Todd in favor of his grandmother, Celia, in the amount of forty thousand dollars ($40,000.00). (DE 66, pg. 6; DE 70, pg. 10). The court dismissed the matter for lack of jurisdiction over Todd, who was a resident of Colorado. (DE 66, pg. 6; DE 70, pg. 10).

Thereafter, on an unspecified date in the year 2003, in case number 03CV2356, Barash filed the same cause of action against Todd in Colorado state court. (DE 66, pg. 6; DE 70, pg. 10). After the action was commenced, Todd filed an affidavit in response, wherein he stated that he had neither signed, nor seen, the note at issue. (DE 66, pg. 6; DE 70, pg. 10). Barash hired a forensic examiner who ultimately concluded that the signature on the note did not belong to Todd. (DE 66, pg. 6; DE 70, pg. 10). Barash thereafter dismissed the action against Todd. (DE 66, pg. 6; DE 70, pg. 10). However, Barash filed an action to recover on the same note against Eric, which will be discussed momentarily. (DE 66, pg. 6; DE 70, pg. 10).

On July 7, 2003, in case number 03 CP 3317, Sandra Barash filed a petition in probate court seeking to invalidate the Last Will and Testament of Irving Kates, despite the fact that Irving Kates' estate had been probated in Palm Beach County in 1983 with no contests to the will. (DE 66, pg. 5; DE 70, pg. 5). After the corporate trustee of the Irving Kates trust filed a counterclaim, Gloria filed a motion to intervene, which was granted. (DE 70, pg. 5). After Sandra dismissed her claim, the case proceeded on Gloria's counterclaim. (DE 70, pg. 5). Following an evidentiary hearing, the probate court issued an order describing how Barash and Sandra used funds from the Celia Kates Trust for their own benefit. (DE 70, pg. 5, exh. D). First, the probate court noted that Sandra issued checks totaling more than one hundred and eighty-seven thousand dollars ($187,000.00) for improvements to the Palm Beach condominium, which was jointly owned by Sandra and Celia, and that because Celia had not been to the Palm Beach condominium since sometime during the year 2001, it was unlikely that the improvements at the condominium would have benefitted anyone other than Sandra or Barash. (DE 70, pg. 5, exh. D). Next, the probate court noted that Sandra and Barash benefitted from over eighty-six

thousand dollars ($86,000.00) in credit card payments from the trust account, that no evidence showed that such payments were for the benefit of Celia. (DE 70, pg. 6, exh. D). In addition, the court noted that almost two hundred thousand dollars ($200,000.00) worth of stocks were transferred out of the Celia Kates Trust, and that the law firm representing Sandra and Barash was paid over eleven thousand dollars ($11,000.00) from the Celia Kates Trust account. (DE 70, pg. 6, exh. D). Finally, the probate court ordered that the attorney's fees for the corporate trustee should be paid out of Sandra's subtrust. (DE 70, pg. 6, exh. D). Although Barash and Sandra appealed the probate court's order that the attorney's fees for the corporate trustee be paid out of Sandra's subtrust, in case number 4D04–3353, the appellate court affirmed the order of the probate court. (DE 66, pg. 5; DE 70, pg. 6, exh. E).

Turning back now to Barash's efforts to collect on the forty-thousand dollar ($40,-000.00) promissory note, on an unspecified date in the year 2004, in case number 04–F796 (CBS), in the United States District Court for the District of Colorado, Barash filed an action against Eric, wherein Barash claimed that Eric had forged Todd's signature on the promissory note. (DE 66, pg. 6; DE 70, pg. 11). Subsequent to commencement of the action, Barash executed an agreement with Gloria, whereby Gloria agreed to opt out of any action against the corporate trustee for the Irving Kates trust for the alleged mismanagement of trust funds, in exchange for Barash's dismissal of his action against Eric. (DE 65, pg. 7; DE 70, pg. 8).

However, prior to dismissal of the action, Barash moved for leave to amend the complaint to add a cause of action for the homicide of Richard Howsam ("Howsam"), Eric's former business partner, as well as to add additional parties unrelated to the promissory note. (DE 70, pg. 11). Upon learning of Barash's allegations that Eric was involved with the death of Howsam, counsel for Gloria obtained a copy of the police file from the Greenwood Police Department of Greenwood, Colorado. (DE 70, pg. 11). In the file, counsel found a letter dated July 11, 2001, drafted by Barash, with an attached letter containing a forged signature of Paul by Barash. (DE 70, pg. 11; DE 50, Defendant's exh. 20).[5] A review of the police file showed that Barash had been trying to convince the police to investigate both Paul and Eric for the death of Howsam, and that Barash sent letters to both Howsam's widow and son in an attempt to obtain information about Howsam's death. (DE 70, pg. 11). The police file also contained three additional letters: (a) a letter from Barash to the United States Securities and Exchange Commission wherein he stated that certain documents filed with the SEC had been examined to ascertain a motive for the unsolved homicide of Howsam, and that such documents appeared "suspect;" (b) a letter from Barash to Metropolitan Life Insurance, wherein Barash represented that he was a private investigator investigating the death of Howsam; and, (c) a letter from Barash to Travelers Insurance wherein Barash again represented himself as a private investigator investigating Howsam's death, and requesting information regarding certain insurance policies. (DE 70, pg. 11, exhs. L, M). In an affidavit submitted by Barash in response to the Court's Order to Show Cause, Barash readily admits to portraying himself as a private investigator in such letters. (DE 71, pg. 31).

---

**5.** Defendant introduced a copy of the letter into evidence at the bench trial herein, and it was designated as Defendant's Exhibit 20. (DE 70, pg. 11; DE 50, Defendant's exh. 20). The letter will be discussed in more detail below.

It should be noted that during his cross and redirect examination at trial, Barash admitted that he sent the letter to Detective John Carr of the Greenwood Police Department in Greenwood, Colorado. (DE 52, pgs. 172–174, 216–218 [6]; DE 50, Defendant's exh. 20). In the letter, referring to the unsolved investigation into Howsam's death, Barash stated that "the only way to crack this difficult case, [*sic*] might be with some trickery." (DE 50, Defendant's exh. 20). Barash continued, "[t]he following suggestions are only that. It is what I might resort to if I were faced with the situation." (DE 50, Defendant's exh. 20). Among the suggestions given to Detective Carr, Barash suggested that the detective call in Eric Siler for an interview, and that during the interview, the detective should show Eric a .45 caliber handgun, marked as if it were a piece of evidence in the case, and tell Eric that his DNA was found on the gun to "bluff" him. (DE 50, Defendant's exh. 20). Barash then suggested that Detective Carr show Eric a statement purportedly given by Paul and ask Eric for any comments on the statement. (DE 50, Defendant's exh. 20). In his letter to the detective, Barash acknowledged that the statement purportedly signed by Paul was "phony." (DE 50, Defendant's exh. 20). In the "phony" statement, Paul purportedly stated that he was with Eric when Eric murdered Howsam, and that Eric offered to pay Paul one million dollars ($1,000,000.00) for Paul's silence. (DE 50, Defendant's exh. 20). Moreover, although in his letter to the detective, Barash stated that he traced Paul's signature from an SEC document, during cross examination at trial, Barash testified, "I did not trace his signature, I copied the signature from an SEC document." (DE 50, Defendant's exh. 20; DE 52, pg. 173).

Barash proceeded *pro se* in nine (9) of the above detailed actions. (DE 66, pgs. 2, 3, 4, 6; DE 70, exh. D, pg. 8; DE 70, exh. E; DE 70, exh. J).

As to Barash's background, Barash testified that while he was "semi-retired" at the time of the bench trial, he previously held various corporate positions in "the mergers and acquisitions business." (DE 52, pgs. 42–46). However, he also noted that in 1952, after enlisting with the United States Army, he spent four (4) months at the military police academy in Fort Gordon, Georgia, where he was trained in the methods of both military police and criminal investigation. (DE 52, pg. 46). In 1953, Barash was deployed to Korea, where he was stationed with the combat military police. (DE 52, pg. 46). In August of 1953, Barash was transferred to the Criminal Investigation Department of the 19th Criminal Investigation Detachment, where he remained until he was discharged from the Army in 1954. (DE 52, pgs. 46–47).

### THE SANCTIONS HEARING

After reviewing the submissions of the parties, the Court entered on Order on September 12, 2006, indicating that McCann would not be sanctioned for his conduct in the instant case. The reasons for the Court's decision will be set forth below. However, at the request of Barash, the Court set the matter for a hearing to consider whether Barash should be sanctioned pursuant to the Court's inherent authority. (DE 73, pg. 2; DE 87).

At the September 26 hearing, after the Court quoted Barash's trial testimony out-

---

**6.** Barash also admitted to discussing the letter with the detective over the telephone. (DE 52, pg. 217).

lined previously, the parties presented their arguments with respect to the sanctions issue. First, Defendant argued that Barash should be sanctioned pursuant to the Court's inherent authority, as set forth in *Chambers v. NASCO, Inc., infra,* for perpetrating a fraud on the court by virtue of his false statements given during the bench trial. Defendant argued that Barash committed perjury by altering his trial testimony to fit the theory of *gift causa mortis,* and that his perjury can been by the fact that he testified to three different versions of the events surrounding the November 17, 2000, letter.[7]

Next, on behalf of Barash, McCann argued that just because the Court chose to find that Barash was not a credible witness at the bench trial, such finding does not automatically lead to the conclusion that Barash should be sanctioned for perjury. McCann argued that there is no evidence of perjury herein, and that just because Barash admitted to committing perjury in the New York litigation, such admission does not automatically lead to the conclusion that Barash perjured himself in this case. In addition, McCann argued that mere inconsistent statements are not a sufficient basis for sanctions, and that the Court needs to find that the instant action was brought in bad faith or for vexatious reasons. Finally, McCann argued that Barash could not be sanctioned pursuant to the Court's inherent authority because Rule 11 would have been the proper vehicle by which to sanction him, and that the Court's inherent authority could not be used where another basis, such as Rule 11, should have been used as a basis for the possible imposition of sanctions.

*DISCUSSION*

## 1. No Sanctions are Warranted Against McCann in this Matter

In the Order to Show Cause, the Court indicated that it was considering imposing sanctions upon McCann pursuant to the 28 U.S.C. § 1927 or the Court's inherent authority. (DE 60). Defendant also moves for the imposition of sanctions upon McCann pursuant to the Court's inherent authority. (DEs 68, 69). The Court will address each basis for sanctions in turn.

### A. 28 U.S.C. § 1927

■ Prior to imposing sanctions under 28 U.S.C. § 1927, three (3) conditions must be met: (1) the conduct must be "unreasonable and vexatious;" (2) the "unreasonable and vexatious" conduct must multiply the proceedings; and, (3) the amount of the sanction cannot exceed the costs occasioned by the objectionable conduct. *See Amlong & Amlong, P.A. v. Denny's Inc.,* 457 F.3d 1180, 1190 (11th Cir.2006) (*quoting Peterson v. BMI Refractories,* 124 F.3d 1386, 1396 (11th Cir. 1997)); *Schwartz v. Millon Air, Inc.,* 341 F.3d 1220, 1225 (11th Cir.2003) (*citation omitted*). An attorney multiplies proceedings "unreasonably and vexatiously" within the meaning of section 1927 only where the attorney's conduct is so egregious that it is "tantamount to bad faith." *Amlong & Amlong, P.A.,* 457 F.3d at 1190 (*quoting Avirgan v. Hull,* 932 F.2d 1572, 1582 (11th Cir.1991)). *See also Schwartz,* 341 F.3d at 1225 (noting that sanctions under section 1927 are designed for attorneys who "willfully abuse the judicial process by conduct tantamount to bad faith," and that "[b]ad faith is the touchstone.") A finding of bad faith turns on the objective conduct of the

---

7. Defendant further requested that Barash be sanctioned for the full amount of attorney's fees incurred as a result of Barash's harassment, or at least for the amount of attorney's fees attributable to the instant case. Howev-

er, the Court noted that at this stage, the Court would only consider the issue of whether or not Barash should be sanctioned in the first instance, and that the amount of any sanction would be decided at a later date.

attorney. *See Amlong & Amlong, P.A.,* 457 F.3d at 1190–1192. In short, where an attorney "knowingly or recklessly" pursues a frivolous claim, or needlessly obstructs the litigation of a non-frivolous claim, then the Court may impose sanctions under section 1927. *See Id.* at 1193.

■ In support of his contention that he should not be sanctioned in this matter, McCann submitted to the Court an Affidavit and a Supplemental Affidavit detailing his development of the case. (DE 64, attachment entitled "Affidavit of James M. McCann;" DE 72, "Supplemental Affidavit of James M. McCann.") Application of the *Amlong* standard to the information presented in McCann's affidavit leads the Court to conclude that McCann has not "knowingly or recklessly" pursued a frivolous claim. Such conclusion is based on several factors.

First, a review of McCann's affidavit shows that he conducted a thorough investigation of the facts underlying the instant cause of action. According to the affidavit, after being retained by Celia in 2004, McCann reviewed all of the documents in the New York action, interviewed Barash, his wife Sandra, and Celia, and concluded that he could not pursue an action for any of the theories espoused in the New York action. (DE 64, Affidavit of James M. McCann, pg. 3). Instead, McCann opted to file the instant cause of action based upon a theory of *gift causa mortis* based on the following facts:

(a) documentation of the proceeds used to fund the joint bank account at issue showed that the proceeds were never owned by Gloria;

(b) documentation from the joint bank account showed that it was created in 1992 with Gloria and Celia named as joint tenants with the right of survivorship, that Gloria was not informed of the existence of the account at the time of its creation, and that Celia did not pay any gift taxes on the transfer of funds into the account;

(c) although Gloria was named as a joint tenant of the account, Gloria made only limited withdrawals from the account beginning in 1996, and only with the express prior written consent of Celia;

(d) Celia was rushed to the hospital in November of 2000 after becoming extremely weak and vomiting blood;

(e) during her one (1) week hospital stay, Celia was restrained in her bed, heavily sedated, and was reportedly confused;

(f) approximately one (1) week after her release, Celia signed a letter, dated November 17, 2000, wherein she resigned her position as trustee of the Irving Kates and Celia Kates trusts, and transferred the assets to Gloria Kates and Sandra Barash;

(g) when McCann questioned Celia as to her purpose for signing the letter, Celia told him that she executed it because she thought she would die in the immediate future, and that she wanted to deliver to Gloria her expected future inheritance as contained in the joint account opened in 1992;

(h) Celia paid no gift taxes on the transfer of assets detailed in the November 17, 2000, letter;

(i) a review of confidential documents held by Celia's attorney prior to McCann, Susan Kornspan, Esq., showed that sometime after the letter of November 17, 2000, was executed, Celia attempted to regain her position as Trustee of the Irving Kates and Celia Kates trusts, and to regain the assets that she had previously given away by virtue of the November 17, 2000, letter;

(j) Celia told McCann that she sought to regain control of the money previously given to Gloria by virtue of the trans-

fer of the joint account because she feared that she would not have enough money to support her during her remaining years. (DE 64, Affidavit of James M. McCann, pgs. 3–6).

Second, according to the affidavit, McCann researched the law prior to commencing the instant action. Such research included research into Florida law on contracts and gifts, which lead to the determination that while he could not pursue an action for breach of contract, he could pursue an action for revocation of a *gift causa mortis*. (DE 64, Affidavit of James M. McCann, pg. 7). In addition, McCann consulted with two (2) tax attorneys [8] to consider the possible tax consequences of the transfer of assets which occurred as a result of Celia's November 17, 2000, letter. (DE 64, Affidavit of James M. McCann, pg. 8).

Third, as to why the case proceeded in the manner in which it did, McCann stated that due to Celia's advanced age, and after discussing the matter with Celia, he decided that the best course of action was to have Celia revoke the transfer of the gift made by virtue of the November 17, 2000, letter by sending another letter to Gloria and proceeding with the instant litigation to enforce the revocation. (DE 64, Affidavit of James M. McCann, pg. 10). McCann stated that he had considered deposing Celia immediately after commencing the instant action. (DE 64, Affidavit of James M. McCann, pg. 10). However, due to her advanced age, and because he thought a deposition would be too confusing for Celia, McCann opted to wait until opposing counsel would depose her, at which time McCann anticipated cross examining her in the event that Celia was not alive at the time of trial. (DE 64, Affidavit of James

M. McCann, pg. 11). After commencing the action, McCann attempted to negotiate a settlement with opposing counsel, and the parties attended a mediation conference. (DE 64, Affidavit of James M. McCann, pg. 11). However, according to McCann, the parties failed to settle because opposing counsel opined that a judicial determination on the merits was needed to correctly report all gift and estate taxes to the IRS. (DE 64, Affidavit of James M. McCann, pg. 12). Therefore, the case proceeded to trial. (DE 64, Affidavit of James M. McCann, pg. 12).

Prior to the trial, Celia died, and Barash was substituted as the Plaintiff as the executor of Celia's estate. (DEs 19, 20). McCann stated that he did not think that Celia's death would prevent the court from making a judicial determination because in many cases, actions for revocation of a *gift causa mortis* are brought after the donor has died. (DE 64, Affidavit of James M. McCann, pg. 12). At trial, McCann opted not to call Sandra as a witness, because he believed that Sandra was too upset to relive the death of her mother and family disputes in open court. (DE 64, Affidavit of James M. McCann, pg. 13). Moreover, McCann concluded that because Sandra's expected testimony would be cumulative to that of Barash, it would be best to present only the testimony of Barash. (DE 64, Affidavit of James M. McCann, pg. 13).

Finally, the Court notes that McCann has not had any significant involvement with any prior litigation between any of the parties. McCann's affidavit shows that (a) McCann has not been involved with any prior litigation between Barash, his wife, Sandra, Celia Kates, or Defendant, with the exception of a probate matter brought in 2003 in the Fifteenth Judicial Circuit in

---

8. McCann met with David Beckett, Esq., an attorney with a Masters of Law degree in Taxation, and Henry Raattama, Esq., a tax attorney and former Chairman of the Tax Division of the Florida Bar. (DE 64, Affidavit of James M. McCann, pg. 8).

and for Palm Beach County.[9] (DE 64, Affidavit of James M. McCann, pg. 2). McCann was retained by Celia Kates for the instant case, and McCann's representation of Barash herein only occurred as a result of Celia's death, and Barash's assumption of the role of executor of Celia's estate. (DE 64, Affidavit of James M. McCann, pg. 2).

In light of the foregoing, the Court concludes that McCann has not "knowingly or recklessly" pursued a frivolous claim, as required by *Amlong & Amlong, P.A.*, 457 F.3d at 1193. As such, the Court declines to sanction McCann pursuant to 28 U.S.C. § 1927.

### B. The Court's Inherent Authority

■ In addition to section 1927, the Court also indicated in its Order to Show Cause that it would consider imposing sanctions upon McCann pursuant to the Court's inherent authority. (DE 60). Defendant has also moved for the imposition of sanctions upon McCann pursuant to such basis. (DEs 68, 69). In short, Defendant argues that McCann should be sanctioned for knowingly or recklessly raising a frivolous argument, in that he suggested a legal theory to fit a set of facts which drastically differed from his clients' sworn statements, and he filed this action based on facts which were known to be in contradiction to his client's sworn statements. (DE 68, pg. 4; DE 69, pg. 6).

With respect to the origins of the inherent powers of the Court, the United States Supreme Court has stated,

It has long been understood that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution," powers

"which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." *United States v. Hudson*, 7 Cranch 32, 34, 3 L.Ed. 259 (1812); *see also Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980) (*citing Hudson*). For this reason, "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Anderson v. Dunn*, 6 Wheat. 204, 227, 5 L.Ed. 242 (1821); *see also Ex parte Robinson*, 19 Wall. 505, 510, 22 L.Ed. 205 (1874). These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630–631, 82 S.Ct. 1386, 1388–1389, 8 L.Ed.2d 734 (1962).

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44, 111 S.Ct. 2123.

■ According to the Eleventh Circuit, "[t]he key to unlocking the inherent power of the Court is a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir.1998). *See also Byrne v. Nezhat*, 261 F.3d 1075, 1106 (11th Cir.2001) (*citing Chambers*, 501 U.S. at 45–46, 111 S.Ct. 2123; *quoting Barnes, supra* ); *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir.1995) ("Invocation of a court's inherent power requires a finding of bad faith."); *Allapat-*

---

**9.** In the probate matter, case number 502003CP003317XXTRIB, McCann defended Celia against a motion filed by Gloria to implead Celia in an effort to enforce a purported settlement agreement. Gloria abandoned her motion to implead Celia, and after Celia's death, at the request of Barash and his wife, Sandra, McCann proposed a settlement which was refused. McCann undertook no further representation of Celia in the matter. (DE 64, Affidavit of James M. McCann, pg. 2).

*tah Srvcs., Inc. v. Exxon Corp.,* 372 F. Supp 2d 1344, 1373 (S.D.Fla.2005) (*citing Barnes, supra; Byrne, supra; and, Mroz, supra* ). In *Chambers,* our High Court refers to the Court's ability to sanction litigants and counsel pursuant to its inherent authority as the "bad faith exception" to the "American Rule," which generally prevents the shifting of attorney's fees. 501 U.S. at 45–46, 111 S.Ct. 2123 (discussing the three exceptions to the "American Rule;" *citing Alyeska Pipeline Srvc. Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)). Under the bad faith exception, the Court may assess attorney's fees where a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers,* 501 U.S. at 45–46, 111 S.Ct. 2123 (*citing Alyeska Pipeline Srvc. Co.,* 421 U.S. at 258–259, 95 S.Ct. 1612).

■ Bad faith can be found in several instances. First, bad faith may be found where the court finds that a "... fraud has been practiced upon it, or that the very temple of justice has been defiled." *Chambers,* 501 U.S. at 46, 111 S.Ct. 2123. Second, bad faith may be found where a party delays or disrupts the litigation, or hampers the enforcement of a court order. *See Id.* Third, the Eleventh Circuit has stated that bad faith may be found where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. *See Barnes,* 158 F.3d at 1214 (*quoting Primus Automotive Fin. Servs., Inc. v. Batarse,* 115 F.3d 644, 649 (9th Cir.1997)). In determining whether sanctions should be awarded under the bad faith standard, "the inquiry will focus primarily on the conduct and motive of a party, rather than on the validity of the case." *Rothenberg v. Sec. Mgmt. Co., Inc.,* 736 F.2d 1470, 1472 (11th Cir.1984).

Application of the foregoing analytical framework leads this Court to find that McCann should not be sanctioned pursuant to the Court's inherent authority. Focusing on McCann's conduct and motives for bringing this action, as detailed in McCann's affidavit, shows that McCann cannot be said to have acted in bad faith in this matter for several reasons. First, there has been no showing that McCann has practiced a fraud upon the Court. *See Chambers,* 501 U.S. at 46, 111 S.Ct. 2123. Second, nothing shows that McCann delayed or disrupted the litigation, or hampered the enforcement of any court order. *See Id.* Third, in light of the fact that McCann has not previously been involved with any prior litigation between the parties, with the exception of a short period of representation of Celia in the 2003 state court probate action, the Court cannot find that McCann argued a meritorious claim for the purpose of harassing an opponent. *See Barnes,* 158 F.3d at 1214. Finally, in light of the Court's previous determination that sanctions should not be awarded under section 1927 because McCann did not "knowingly or recklessly" pursue a frivolous claim, as required by *Amlong & Amlong, P.A.,* 457 F.3d at 1193, it logically follows that the Court cannot find that McCann knowingly or recklessly raised a frivolous argument for purposes of imposing sanctions pursuant to the Court's inherent authority. *See Id.* Moreover, considering the factual and legal investigation McCann undertook prior to filing this action, as documented within his affidavit, the Court cannot find that McCann knowingly or recklessly raised a frivolous argument. Accordingly, this Court declines to impose sanctions *sua sponte* upon McCann pursuant to the Court's inherent authority. Likewise, **IT IS HEREBY ORDERED THAT** Defendant's Motion for Sanctions as to McCann is **DENIED.** (DE 68).

## 2. Sanctions Against Barash

### A. 28 U.S.C. § 1927

■ Although the Court initially considered imposing sanctions against Barash pursuant to 28 U.S.C. § 1927, as noted in the Court's Order to Show Cause, (DE 60), the Court recognizes that section 1927 applies only to attorneys or persons admitted to conduct cases in a court of law. *See Avirgan v. Hull,* 932 F.2d 1572, 1582 (11th Cir.1991) (affirming district court's award of sanctions against counsel and his firm under § 1927, and sanctions against the plaintiffs individually pursuant to the bad faith exception because they willfully abused the judicial process by conduct tantamount to bad faith) (*citing Roadway Express, Inc. v. Piper,* 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980)); *Travelers Ins. Co. v. St. Jude Hosp. of Kenner, La., Inc.,* 38 F.3d 1414, 1416 (5th Cir.1994) (noting that § 1927 sanctions are only imposed against attorneys, not clients); *Ted Lapidus, S.A. v. Vann,* 112 F.3d 91, 96 (2d Cir.1997), *cert. denied,* 522 U.S. 932, 118 S.Ct. 337, 139 L.Ed.2d 262 (1997) (noting that § 1927 sanctions apply only to attorneys). As such, sanctions would not be proper against Barash pursuant to section 1927, and this Court declines to sanction Barash pursuant to such section.

### B. Rule 11

■ "Although typically levied against an attorney, a court is authorized to issue Rule 11 sanctions against a party even though the party is neither an attorney nor the signor of the pleadings." *Byrne,* 261 F.3d at 1106 (*citing Souran v. Travelers Ins. Co.,* 982 F.2d 1497, 1508, n. 14 (11th Cir.1993)). Clients are generally sanctioned for factual misrepresentations in the pleadings, or where it is clear that the client is the "mastermind" behind the

frivolous case. *See Id.* at 1118 (*citing White v. Gen. Motors Corp.,* 908 F.2d 675, 686 (10th Cir.1990); *Pelletier v. Zweifel,* 921 F.2d 1465 (11th Cir.1991)). Moreover, sanctions "... should fall upon the individual responsible for the filing of the offending document." *See Byrne,* 261 F.3d at 1120 (*quoting Chevron, USA, Inc. v. Hand,* 763 F.2d 1184, 1187 (10th Cir. 1985)).

■ Application of the foregoing leads the Court to conclude that sanctions should not be imposed upon Barash pursuant to Rule 11 for two reasons. First, it has not been shown that Barash has made any factual misrepresentations in the pleadings.[10]

Second, it has not been shown that Barash is the "mastermind" behind the case, or that he is the individual responsible for the filing of any offending document. While the evidence shows that Barash has a litigious history, that he appears to be a master manipulator, and that he uses and abuses the judicial process to for his own financial gain, this Court must acknowledge that Barash was not the original filing plaintiff herein, and that Barash was only substituted in as executor of Celia's estate after Celia died. And, while the Court notes that Barash's wife, Sandra, brought the action with Celia under a power of attorney, the fact remains that McCann's affidavit shows that *Celia* retained him for this action, and that after investigating the facts and applicable law, *McCann,* not Barash, opted to prosecute the action under the theory of revocation of a *gift causa mortis.*

Although the instant case is somewhat similar to *Pelletier,* 921 F.2d 1465, in that both the instant case and *Pelletier* involve

---

10. Moreover, as indicated with the Court's Order to Show Cause, the Court's focus is whether or not Barash was purposefully deceptive in his *testimony* adduced at the bench trial. (DE 60).

individuals scheming to extort settlements from their opponents, the instant case is distinguishable from *Pelletier* in one key respect. In *Pelletier*, the sanctioned individual was the attorney's client and filing plaintiff.[11] That is, the sanctioned individual was the plaintiff responsible for the filing of the case. However, here, after the filing plaintiff died, Barash was substituted in as a representative of the deceased plaintiff's estate. As such, Barash is not the original, true plaintiff. Moreover, given the evidence contained in the record as to McCann's development of the case, the Court cannot find that Barash is the party responsible for the filing of any document. As such, the Court declines to sanction Barash pursuant to Rule 11.

## C. The Court's Inherent Authority

However, whether or not Barash can be sanctioned pursuant to the Court's inherent authority is a separate, albeit related, matter. Defendant argues that Barash should be sanctioned pursuant to the Court's inherent authority for pursuing this action in bad faith, in that he "participated in and then maintained the action for personal gain." (DE 69, pgs. 9–10). Defendant also argues that Barash's admitted perjury and abuse of the judicial system justifies the imposition of sanctions pursuant to the Court's inherent authority. (DE 69, pgs. 10–11). As indicated in the previously issued Order to Show Cause, the Court's focus is whether or not Barash was "purposefully deceptive in his testimony and the facts of this litigation." (DE 60, pg. 2).

As noted previously, the powers stemming from the Court's inherent authority are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers*, 501 U.S. at 43, 111 S.Ct. 2123 (*quoting Link v. Wabash R. Co.*, 370 U.S. 626, 630–631, 82 S.Ct. 1386, 1388–1389, 8 L.Ed.2d 734 (1962)). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44, 111 S.Ct. 2123.

"The key to unlocking the inherent power of the Court is a finding of bad faith." *Barnes*, 158 F.3d at 1214. *See also Byrne*, 261 F.3d at 1106 (*citing Chambers*, 501 U.S. at 45–46, 111 S.Ct. 2123; *quoting Barnes, supra*); *In re Mroz*, 65 F.3d at 1575; *Allapattah Srvcs., Inc.*, 372 F.Supp.2d at 1373(*citing Barnes, supra; Byrne, supra; and, Mroz, supra*). Sanctions may be imposed where a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers*, 501 U.S. at 45–46, 111 S.Ct. 2123 (*citing Alyeska Pipeline Srvc. Co.*, 421 U.S. at 258–259, 95 S.Ct. 1612). Of particular import to the situation involving Barash, bad faith may be found, *inter alia*, where the court finds that a "... fraud has been practiced upon it, or that the very temple of justice has been defiled." *Chambers*, 501 U.S. at 46, 111 S.Ct. 2123. If the Court finds that a fraud has been practiced upon it, or that the very temple of justice has been defiled, the Court may assess attorney's fees against the responsible party. *See Id.* As noted by our High Court in *Chambers*,

... the imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent

---

11. In *Pelletier*, 921 F.2d at 1514–1522, the Eleventh Circuit affirmed the imposition of Rule 11 sanctions upon the client and his attorney because (1) the attorney and his client knew that the claim was factually groundless when filed, but pursued it in bad faith nevertheless; (2) the evidence showed that the client instituted the case as part of a scheme to extort a settlement; and, (3) the client was skilled in the law.

power to police itself, thus serving the dual purpose of "vindicat[ing] judicial authority without resort to the more drastic sanctions available for contempt of court and mak[ing] the prevailing party whole for expenses caused by his opponent's obstinacy."

*Id.* at 46, 111 S.Ct. 2123 (*quoting Hutto v. Finney,* 437 U.S. 678, n. 14, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)).

■ At the hearing held on September 26, 2006, McCann argued on behalf of Barash that Barash could not be sanctioned under the Court's inherent authority because other avenues supported the imposition of sanctions; namely, Rule 11. However, the Court disagrees for two reasons. First, as noted in the previous section, Rule 11 cannot properly serve as a basis to sanction Barash herein.

Second, in *Chambers,* the United States Supreme Court held that Court's inherent authority to impose sanctions is not displaced merely because particular statutes or rules may likewise provide a basis for the imposition of sanctions. *See Id.* at 46, 111 S.Ct. 2123. In so holding, the Court first noted that other statutes or rules "are not substitutes for the inherent power," because the inherent authority is "both broader and narrower" than other rules and statutes, in that while other rules or statutes may reach only certain individuals or conduct, "the inherent power extends to a full range of litigation abuses." *Id.* As a result, the Court observed that "the inherent power must continue to exist to fill in the interstices." *Id.* Second, the Court reasoned that "while the narrow exceptions to the American Rule effectively limit a court's inherent power to impose attorney's fees as a sanction to cases in which a litigant has engaged in bad-faith conduct or willful disobedience of a court's orders, many of the other mechanisms permit a court to impose attorney's fees as a sanction for conduct which merely fails to meet a reasonableness standard." *Id.* at 47, 111 S.Ct. 2123. Third, the Court recalled that Supreme Court precedent showed that the inherent authority of the Court can be invoked even where procedural rules exist to sanction the same conduct. *See Id.* at 48, 111 S.Ct. 2123 (*quoting Link,* 370 U.S. at 630–632, 82 S.Ct. 1386; *citing Roadway Express,* 447 U.S. at 767, 100 S.Ct. 2455).

■ Turning now to the applicable standards, the Court has found no Eleventh Circuit opinion discussing the standard that the Court should apply when deciding whether to impose sanctions pursuant to the Court's inherent authority for fraud upon the Court. However, other courts have required that when imposing attorney's fees as sanctions pursuant to their inherent authority, the conduct be proven by clear and convincing evidence. *See Autorama Corp. v. Stewart,* 802 F.2d 1284, 1287–1288 (10th Cir.1986) ("Hence, it is not surprising that attorneys' fees are awarded only when there is 'clear evidence' that challenged actions are taken entirely without color and are pursued for reasons of harassment or delay.") (*citations omitted*); *Weinberger v. Kendrick,* 698 F.2d 61, 80 (2d Cir.1982) ("We have required ... that there be 'clear evidence' that the challenged actions 'are entirely without color and [are taken] for reasons of harassment or delay or for other improper purposes ...' ") (*citations omitted*), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). Moreover, in *Shepherd v. Am. Broad. Cos., Inc.,* 62 F.3d 1469, 1476–1478 (D.C.Cir.1995), the D.C. Circuit held that prior to imposing the sanction of dismissal or default for fraud upon the court, the fraud must be proven by clear and convincing evidence. (*citing Aoude v. Mobil Oil Corp.,* 892 F.2d 1115 (1st Cir.1989); *Pfizer, Inc. v. Int'l Rectifier Corp.,* 538 F.2d 180, 195 (8th Cir.1976),

*cert. denied,* 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977)).

Courts are split as to whether perjury or false statements, standing alone, provide a sufficient basis for the imposition of sanctions pursuant to the Court's inherent authority. *See Kadri v. Johnson,* No. 03–2562 M1/V, 2005 WL 3454330, *2–*3 (W.D.Tenn. Dec.16, 2005) (holding that perjured testimony, standing alone, does not constitute "fraud upon the court.") (*citing Quality Tech. Co. v. Stone & Webster Eng'g Co.,* Nos. 92–5434, 92–5628, 1993 WL 375803, *3, 7 F.3d 234 (6th Cir. Sept. 23, 1993) (*unpublished*)). *But see Allen v. Chicago Transit Auth.,* 317 F.3d 696, 703 (7th Cir.2003) (observing that although perjury committed in the course of legal proceedings constitutes a fraud on the court, not every case of perjury would warrant dismissal of the case).

The Eleventh Circuit has even stated that false statements alone do not indicate bad faith so as to warrant the imposition of sanctions under the Court's inherent authority. *See Byrne,* 261 F.3d at 1125. However, the Eleventh Circuit elaborated,

> ... false statements alone do not indicate bad faith. Without a "smoking gun" statement from the plaintiff, i.e., "I know my claim is frivolous and I am pursuing this claim to harass the defendants," a district court makes a determination of bad faith by drawing inferences from the conduct before it. Standing alone, a false or inconsistent statement in a deposition does not compel the conclusion of bad faith. A false statement can be evidence of bad faith, if, for instance, there is other evidence in the record indicating that the statement was made for a harassing or frivolous purpose.

261 F.3d at 1125. The Court thereafter went on to hold that the client should not have been sanctioned pursuant to the Court's inherent authority, notwithstanding the fact that she made several false assertions in affidavits, depositions, and sworn statements filed with the court, because the record was devoid of any evidence from which the court could infer that the client knew her claim was frivolous or that she sought to harass the defendants. *See Id.*

Contrary to *Byrne,* the record herein contains ample evidence from which the Court can infer that Barash knew the claim was unsupported and sought to use perjured testimony to turn a deficient claim [12] into a vehicle to harass Gloria Kates and deprive her of the trust for his own benefit. Barash showed his propensity for perjury when he (a) freely admitted at trial that he committed perjury in the New York action by submitting sworn statements that he knew to be false; and, (b) admitted at a second point at trial that he would commit perjury for Celia if she asked him to. Barash's propensity for perjury in turn reflects upon his history of scheming and manipulation. Moreover, his demeanor before the Court during the bench trial clearly shows the level of animosity that Barash feels for Gloria, as well as his domineering, manipulative characteristics.

In addition, the following acts illustrate the lengths to which Barash has gone in the past to achieve his goals: (a) Barash lied as to his involvement in the preparation of the letter of November 17, 2000, in that he testified to three (3) different versions of his involvement and receipt of the letter; (b) Barash lied about why he committed perjury in the New York action in an attempt to cover up his role in the case,

---

12. In the previously issued Memorandum of Decision, the Court addressed the legal deficiency of the claim of *gift causa mortis.* (DE 58).

and deflect responsibility for his actions; and, (c) Barash has proceeded in no less than nine (9) lawsuits against Gloria or her family in an attempt to gain control over as much of Celia's assets as possible.

Finally, for two reasons, the record belies Barash's trial testimony that Celia initiated the November 17, 2000, letter because she thought she was going to die and she wanted "everything to be in order" when she died. First, as previously noted, the November 17 letter accomplished nothing that would not have happened automatically upon Celia's death. It is too incredible for the Court to believe that 94 year old Celia would have initiated the letter without Barash's assistance or knowledge, only one week after her hospital release, given other testimony, both Barash's and Gloria's, as to Celia's weakened physical and mental condition upon her release. Second, the Court notes that in 2001, a date much closer in time to the drafting of the of the letter of November 17, 2000, Barash testified that he had prepared the November 17 letter. (DE 52, pg. 200). Of course, it was in Barash's best interest to accomplish the objectives of the November 17 letter since it would give his wife more control over substantial funds.

The Court finds that the record demonstrates that Barash initiated the letter to get as much control over the family assets as he could, his common scheme and plan demonstrated over many years of litigation. Only later did Barash seek to extend his control over the rest of the assets distributed in the November 17 letter by attempting to recreate history and deprive Gloria of the collateral benefit she realized from the November 17 letter.

In short, given Barash's open display of animosity and imperious behavior at trial, and given the evidence in the record detailing Barash's history of using and abusing the judicial process for his own financial gain, as well as the circumstances surrounding the alleged *gift causa mortis*, the Court concludes that Barash used the instant action to harass Gloria and her family.

The instant case is similar to *Vargas v. Peltz*, 901 F.Supp. 1572, 1573–1578 (S.D.Fla.1995), where the plaintiffs manufactured physical evidence and offered false testimony in support of their claim of sexual harassment. Although the Court has not found that Barash introduced manufactured *physical* evidence at trial in support of the theory of *gift causa mortis*, he did offer false testimony as to his involvement with the November 17 letter and Celia's state of mind at the time of the alleged *gift causa mortis*.

The instant case is also similar to *Belak v. Am. Eagle, Inc.*, No. 99–3524–CIV, 2001 WL 253608, *2, *4 (S.D.Fla. March 12, 2001), where the court found that the plaintiff knowingly gave false deposition testimony because it would benefit her case in the event the case proceeded to trial because here, Barash, who has freely admitted to perjuring himself in the New York litigation, and who further admitted that he would commit perjury again if Celia asked him to do so, testified in a knowingly false manner as to the facts supporting the theory of *gift causa mortis*. Just as the plaintiff in *Belak* gave knowingly false testimony to advance her claim, so the Court infers that Barash was purposefully deceptive in his testimony and the facts of this litigation to advance the case at hand, in that he changed his testimony of the events surrounding the initiation of the November 17, 2000, letter, and he manufactured statements by Celia to belatedly support the *gift causa mortis* theory.

In making such inference, the Court finds it noteworthy that neither Celia nor Barash contemporaneously alleged circum-

stances to support a theory of *gift causa mortis*. The Court finds it incredible to believe that Celia, without Barash's assistance, would have drafted the letter of November 17, 2000, after having been so close to death only seven days prior.[13] Rather, the Court finds that the content of the November 17 letter is consistent with Barash's motive at the time of having Sandra obtain control over the joint account. Moreover, Barash's current trial testimony as to the events surrounding the November 17 letter, that he was surprised when he received the letter and that Celia thought she was going to die and intended to put everything in order, is consistent with Barash's later motive to extend his control over not only Sandra's portion of Celia's assets, but Gloria's as well. By offering false testimony as to the events surrounding the November 17 letter, testimony which the Court notes is inconsistent with other evidence in the case, Barash provided the only evidence of intent to support the theory of *gift causa mortis*, all to harass Gloria and her family, and all for his own financial gain.

The Court is confident that the circumstances of the instant case meet the parameters as outlined by *Byrne*, 261 F.3d at 1125. Moreover, the Court finds that Barash's purposeful deceptiveness in his testimony and the facts of this litigation constitute a fraud upon the Court, and that such fraud has been established by clear and convincing evidence. *See Autorama Corp.*, 802 F.2d at 1287–1288; *Weinberger*, 698 F.2d at 80; *Shepherd*, 62 F.3d at 1476–1478.

### CONCLUSION

Accordingly, **IT IS HEREBY ORDERED AS FOLLOWS:**

1.) The Court **SUA SPONTE ORDERS THAT** Barash be sanctioned pursuant to the Court's inherent authority, in an amount to be determined at a later date.

2.) **IT IS FURTHER ORDERED THAT** Defendant's Motion for Sanctions is **GRANTED IN PART.** (DE 68).

3.) **IT IS FURTHER ORDERED THAT,** within **30 DAYS** of the entry of the Court's Order, the parties submit memoranda of law and supporting materials to the Court as to the amount of sanction to be imposed. The parties shall also indicate whether an evidentiary hearing is requested.

---

**13.** The evidence shows that Celia was discharged from the hospital on November 10, 2000. (DE 50, Plaintiff's exh. 36).